UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KAITLYN C.,[1]                        )
                                      )
              Plaintiff,              )
                                      )
       v.                             )          No. 1:21-cv-00931-MJD-TWP
                                      )
KILOLO KIJAKAZI,                      )
                                      )
              Defendant.              )

**ENTRY ON JUDICIAL REVIEW**

Claimant Kaitlyn C. requests judicial review of the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying her application for Childhood

Disability Benefits ("CDB") under Title II of the Social Security Act ("the Act") and

Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. §

402(d)(1)(G); 42 U.S.C. § 1382. For the reasons set forth below, the Court **REVERSES** the

decision of the Commissioner.

## I.  Background

Claimant applied for CDB and SSI in 2018, alleging an onset of disability as of

December 20, 2015. [Dkt. 15-5 at 9.] Claimant's applications were denied initially and again

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

upon reconsideration, and a hearing was held before Administrative Law Judge Jody Hilger Odell ("ALJ") on August 11, 2020. [Dkt. 15-2 at 37-69.] On November 10, 2020, ALJ Odell issued her determination that Claimant was not disabled. [Dkt. 15-2 at 13.] The Appeals Council then denied Claimant's request for review on March 1, 2021. [Dkt. 15-2 at 2.] On April 15, 2021, Claimant timely filed her Complaint in this Court seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II.  Legal Standards

To be eligible for SSI or CDB, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 CFR § 416.905; 20 CFR § 404.1505(a). To be eligible for CDB, a claimant must additionally show that her disability began before the age of 22. 42 U.S.C. § 402(d)(1)(G); 20 CFR 404.350(a)(5).[2]

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, see 20 CFR Pt. 404, Subpt. P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her

---

[2] Claimant alleges an onset of disability as of December 20, 2015. She turned 22 on June 23, 2019.

past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can perform certain other available work, she is not disabled. 20 CFR § 416.920(a)(4). Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). While an ALJ need not address every piece of evidence, she "must provide a 'logical bridge' between the evidence and [her] conclusions." *Varga*, 794 F.3d at 813 (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010)). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

## III. ALJ Decision

ALJ Odell first determined that Claimant had not engaged in substantial gainful activity since her alleged onset date of December 20, 2015. [Dkt. 15-2 at 19.] At step two, the ALJ found that Claimant had the following severe impairments: "asthma, migraines, fibromyalgia, post-traumatic stress disorder, and major depressive disorder." [Dkt. 15-2 at 19.] The ALJ determined

that Claimant's "vision issues, chronic umbilical fistula, nasal polyps, arthritis, gastroesophageal reflux disease, pseudoangiomatois stomal hyperplasia of the breast, and obesity" were non-severe. [Dkt. 15-2 at 19.] At step three, the ALJ found that Claimant's impairments did not meet or medically equal a listed impairment during the relevant time period. [Dkt. 15-2 at 20.] ALJ Odell then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; never be exposed to pulmonary irritants such as concentrated fumes, odors, dusts, and gases; the claimant is limited to simple, routine tasks; make simple, work-related decisions; should never interact with the general public; occasionally interact with supervisors and coworkers; can concentrate, attend, and persist for two hours at a time, up to eight-hours in a workday; and is able to manage routine changes in the work environment.

[Dkt. 15-2 at 23.]

At step four, ALJ Odell found that Claimant did not have any past relevant work. [Dkt. 15-2 at 28.] At step five, relying on testimony from a vocational expert ("VE"), the ALJ determined that Claimant was able to perform jobs that exist in significant numbers in the national economy, such as mail clerk (DOT 209.687-026), office helper (DOT 239.567-010), and sorter (DOT 361.687-014). [Dkt. 15-2 at 28-29.] Accordingly, ALJ Odell concluded that Claimant was not disabled. [Dkt. 15-2 at 29.]

## IV.  Discussion

Born in 1997, Claimant's childhood was replete with sexual, physical, and emotional abuse at the hands of her parents and others. In addition, she was forced to make and use methamphetamine by her mother from ages 13 to 19, and she began excessively drinking alcohol by the time she was 14 years old. Claimant completed eleventh grade and subsequently obtained

4

her GED, although she had a history of behavioral problems in school. She alleges disability due to her chronic depression, PTSD, migraines, vision issues, fibromyalgia, asthma, degenerative arthritis, chronic pain, GERD, nasal palpus, pseudoangiomatois stomal hyperplasia of the breast, and possible cyst in her belly button.

Claimant now asks the Court to reverse ALJ Odell's decision on the grounds that the ALJ erred by (1) rejecting all opinions in the record regarding limitations from Claimant's severe PTSD and depression; (2) formulating an RFC that lacks any limitations resulting from Claimant's severe migraines; and (3) failing to address whether Claimant could meet on-task requirements. [Dkt. 17.] The Commissioner responds that reversal is inappropriate because the ALJ based her decision on substantial evidence. [Dkt. 18.] As explained below, the Court agrees with Claimant that the ALJ's decision must be reversed.

### A. The ALJ Erred by Filling the Evidentiary Gap Left by Her Rejection of All Medical Opinions in the Record with Her Own Lay Interpretation of the Evidence

Claimant first argues that, after finding all of the medical opinions in the record concerning Claimant's mental impairments "not persuasive," the ALJ erred by basing Claimant's RFC on her own lay interpretation of the evidence. [Dkt. 17 at 13.] In response, the Commissioner asserts that the ALJ was not required to retain an additional medical expert. [Dkt. 18 at 7.]

The Seventh Circuit has made clear that "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *cf. Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Stage v. Colvin*, 812 F.3d 1121, 1125-26 (7th Cir. 2016); *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018). The reasoning for this rule is sound: without the benefit of an expert opinion, ALJs are simply not qualified to make

their own medical determinations. *Akin*, 887 F.3d at 318; *see Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). To remedy a lack of sufficient medical evidence, the regulations encourage ALJs to recontact a claimant's medical sources, request additional existing evidence, ask the claimant to undergo a consultative examination at the Agency's expense, and/or ask the claimant or others for more information. 20 CFR § 416.920b(b)(2).

Here, the record contains medical opinions from State agency psychologists Donna Unversaw, Ph.D., and J. Gange, Ph.D.; consultative examiner E. Ann Miller, Ph.D., HSPP; and treating therapist Candace Schmidt, Psy.D., HSPP. However, the ALJ rejected each of these opinions.

In December 2018 and April 2019, State agency psychologists determined that Claimant did not have any severe mental impairments, stating that "minimal treatment [history]" and "[r]eports of fixing[3] do not suggest severe limits in activities stemming from psych."[4] [Dkt. 15-3 at 8.] As a result, Dr. Unversaw and Dr. Gange found that Claimant did not have any limitations stemming from her mental impairments. The ALJ found these opinions unpersuasive, finding that Claimant had the severe mental impairments of post-traumatic stress disorder and major depressive disorder, and that the record evidence was consistent with a finding that these impairments cause some limitations. [Dkt. 15-2 at 27.]

---

[3] The State agency psychologists reference a September 2018 hospital visit in which Claimant was "seen for cuts/infection which she claims occurred while in the process of 'remodeling our home and ripping up carpet.'" [Dkt. 15-3 at 8.]

[4] *But see* [Dkt. 15-3 at 9] (stating that Claimant's statements about the intensity, persistence, and functionally limiting effects of her symptoms of pain, sustained concentration and persistence limitations, and social interaction limitations are "substantiated by the objective medical evidence alone").

In June 2018, Claimant's primary care provider referred her to Dr. Schmidt for an assessment of symptoms potentially related to ADHD. [Dkt. 15-8 at 337.] Dr. Schmidt, who became Claimant's therapist, completed a detailed psychological evaluation on December 10, 2018. [Dkt. 15-8 at 337-44.] Dr. Schmidt's behavioral observations included the following:

> [Claimant] appeared extremely tired and stated she did not sleep the night before. [Claimant's] level of motivation fluctuated throughout the testing process, which may have been related to fatigue. [Claimant] stated she felt stressed and overwhelmed by the testing process and the sound machines present in the office. During the CPT-3 [Conners Continuous Performance Test, Third Edition], she appeared focused. However, she stated her eyes were "crossing" and that the measure was "playing with [her] double vision." As a result, she took her glasses off during the administration. [Claimant] was observed fidgeting in her seat frequently throughout the CPT-3 administration. During the CATA [Conners Continuous Auditory Test of Attention], [Claimant] appeared focused but closed her eyes. She indicated she felt she was getting a migraine. [Claimant] was offered two breaks during the administration of the WAIS-IV [Wechsler Adult Intelligence Scale, Fourth Edition]. She declined the first break but accepted the offer the second time. [Claimant] continued to appear fatigued during the WAIS-IV as evidenced by frequent yawning and excessive blinking.

[Dkt. 15-8 at 339.] Testing results revealed that, "[c]ompared to same-aged peers, [Claimant] performed in the Low Average range in terms of overall intellectual functioning"; Claimant's "working memory and/or processing speed abilities interfere with her other intellectual abilities"; and "she demonstrated a relative weakness" on the subtest assessing "short-term visual memory, visual-motor coordination (e.g., the ability to coordinate visual information with motor output), speed of mental operation, and attention and concentration." [Dkt. 15-8 at 340-41.] Claimant performed in the "Low Average" range on tests measuring (1) "graphomotor speed and accuracy, incidental learning (e.g., learning that occurs during the process of completing a task or activity), and visual working memory," (2) "an individual's ability to sustain attention and concentration," (3) "mental manipulation, concentration, attention, short-term and long-term memory, and numerical reasoning ability," and (4) "an individual's ability to acquire, retain, and retrieve

general factual knowledge." [Dkt. 15-8 at 341.] In her Summary of Findings, Dr. Schmidt opined as follows:

> Results from the WAIS-IV placed [Claimant's] overall cognitive functioning in the Low Average range. . . . She performed in the Average range on tasks assessing verbal and nonverbal reasoning and problem-solving. She performed in the Low Average range on tasks assessing working memory and in the Borderline range on tasks measuring processing speed.
>
> Assessment of [Claimant's] attention and concentration did not indicate the presence of a biologically-oriented ADHD classification. Specifically, [Claimant] did not demonstrate significant variability on indices that indirectly measure attention on the WAIS-IV. Additionally, results from the CPT-3 and CATA fell in the normative range and did not reflect the presence of a disorder characterized by attention deficits. The CAARS [Connors Adult ADHD Rating Scales] forms were completed by [Claimant] and an observer. Results from these forms indicated [Claimant] exhibits several symptoms commonly associated with ADHD including inattention, hyperactivity, and impulsivity. Additionally, results from these forms indicated she may exhibit emotional lability and problems with self-concept. Many mental health conditions can manifest as inattention. Given the lack of evidence for ADHD on the WAIS-IV, CPT-3, and CATA, it is likely that [Claimant's] symptoms are better accounted for by another mental health condition, such as anxiety, depression, or trauma. Furthermore, results from cognitive testing indicate [Claimant's] processing speed is considerably lower than expected for someone her age. It is likely that her processing speed is interfering with her ability to sustain concentration.

[Dkt. 15-8 at 343.] Dr. Schmidt listed Claimant's diagnoses as "Other Specified Trauma- and Stressor-Related Disorder," "Unspecified Depressive Disorder," and "Unspecified Anxiety Disorder." [Dkt. 15-8 at 343.] She also included "Rule Out" diagnoses of bipolar disorder and major depressive disorder. [Dkt. 15-8 at 343.]

In acknowledging Dr. Schmidt's opinion, the ALJ stated that Dr. Schmidt "did not opined [sic] regarding a function-by-unction [sic] analysis" and, "[w]hile the exam was considered in this decision, there was not a functional opinion to evaluate for persuasiveness." [Dkt. 15-2 at 27.] However, it was error for the ALJ not to evaluate Dr. Schmidt's medial opinion and assign it weight—especially since so much of Dr. Schmidt's evaluation is contrary to the ALJ's RFC

assessment. As illustrated above, Dr. Schmidt's summary of findings provided extensive testing results regarding Claimant's cognitive functioning, working memory, processing speed, and inability to sustain attention. These findings could have assisted the ALJ in formulating Claimant's RFC, despite not providing a "function-by-function analysis," and thus the ALJ should have evaluated Dr. Schmidt's opinion for persuasiveness and, if needed, requested further clarification from Dr. Schmidt. *See* 20 CFR § 416.920c(b); 20 CFR § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").

Similarly, on November 28, 2018, consultative examiner Dr. Miller met with Claimant and compiled a Mental Status Examination Report. [Dkt. 15-8 at 326-30.] Dr. Miller's Medical Source Statement is as follows:

> [Claimant] was referred for an adult mental status evaluation related to the alleged disabilities of depression and PTSD. [Claimant] reported that her depression began in 2008 related to the death of a great grandparent. She denied any period of relief in her depression since that time, indicating that she currently struggles with lack of motivation, lethargy, daily crying, and generalized sadness. [Claimant] additionally reported that she suffers from post trauma related to having been raped by her biological father and having been the victim of physical abuse at the hands of multiple perpetrators including her father, mother, and former boyfriends. [Claimant] indicated that she suffers from regular nightmares, anxiety, hypervigilance regarding her surroundings, and the desire to isolate herself. She reported her family mental health history to be positive for depression, anxiety, suicide, alcoholism, and drug addiction. [Claimant] denied current use of psychotropic medication, reporting that previous attempts to take anti-depressants have resulted in psychotic episodes. She has a GED and has held two jobs but not worked since 2015. [Claimant] indicated that she only has one living relative to whom she speaks. She reported that she spends most days cleaning, coloring, watching television, and playing video games with her friends. [Claimant] currently suffers from drug and alcohol issues. The results of cognitive mental status items indicate estimated functioning in the lower end of the average range, with some difficulty in abstract reasoning. At this time, she avowed visual and auditory hallucinations.

[Dkt. 15-8 at 329.] Dr. Miller's diagnostic impressions included "Major Depressive Disorder, Single Episode, Severe with Psychotic Features" and "Post Traumatic Stress Disorder, by report." [Dkt. 15-8 at 329.]

Again, the ALJ stated that Dr. Miller "did not opined [sic] regarding a function-by-function analysis" and, "[w]hile the exam was considered in this decision, there was not a functional opinion to evaluate for persuasiveness." [Dkt. 15-2 at 27.] However, regardless of whether Dr. Miller's exam included a "function-by-function analysis," the ALJ was still required to consider her opinion as evidence. *See* 20 CFR § 416.920c. Moreover, the regulations specifically require that, if the ALJ finds the consultative examiner's report to be "inadequate or incomplete," the ALJ must "contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." 20 CFR 416.919p(b). ALJ Odell did not do so. As Claimant points out, the ALJ "did not involve a psychologist before, during, or after the hearing to provide an opinion about [Claimant's] abilities and limitations." [Dkt. 17 at 16.]

Having rejected all of the medical opinions in the record, the ALJ was left with an "evidentiary deficit" that she could not reasonably fill with her lay interpretation. *Suide v. Astrue, 371 Fed. App'x 684, 690 (7th Cir. 2010)*; *Vincent G. v. Saul, 2020 WL 3046435, at *9 (N.D. Ind. June 8, 2020)*. Rather, "[w]hen faced with such a deficit, the ALJ should have summoned a medical expert who could have reviewed all of the medical evidence, and would have offered limitations that were grounded in the evidence." *Jennifer B. v. Saul, 2020 WL 2520996, at * 8 (N.D. Ind. May 18, 2020)* (citing *Daniels v. Astrue, 854 F. Supp. 2d 513, 523 (N.D. Ill. 2012)* ("Once the ALJ determined that [the medical opinions] were insufficient and unsupported by the

medical evidence, the ALJ had a duty to conduct an appropriate inquiry to fill that gap. What the ALJ could not do was fill the gap on her own.")).

In response, the Commissioner argues that ALJ Odell was not required to obtain additional medical opinions because Claimant did not request as much. [Dkt. 18 at 7.] This reasoning essentially amounts to a waiver argument, but "Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000); 20 CFR § 416.1400(b). "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 111 (citing *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971)); *see Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) ("[T]he procedure for adjudicating social security disability claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.") (citing 20 CFR § 416.927(a)(3)). Indeed, "[a]n ALJ is under an obligation to develop a 'full and fair record.'" *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (citing *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)); *see* 20 CFR § 416.945(a)(3) ("[B]efore we make a determination that you are not disabled, we are responsible for developing your complete medical history."). This is especially true in cases, like here, where the ALJ faults the State's own consultative examiner for not providing an adequate report, yet fails to remedy the issue as set forth in 20 CFR § 416.919p(b).

Ultimately, "it was the ALJ's responsibility to recognize the need for further medical evaluations of [Claimant's] conditions before making her residual functional capacity and disability determinations." *Suide*, 371 Fed. App'x at 690. Indeed, without at least some reliance on any medical opinions, substantial evidence is lacking from the ALJ's RFC determination. ALJ Odell's failure in this regard constitutes reversible error, because her lay interpretation of

Claimant's medical records cannot provide the requisite logical bridge between the evidence and her conclusions. On remand, if the ALJ again rejects all medical opinions of record, she must take care to seek additional medical opinions to fill that evidentiary gap before formulating Claimant's RFC.

**B.   The ALJ Erred in Her Assessment of Limitations Resulting from Claimant's Severe Migraines**

Claimant additionally argues that, despite correctly finding Claimant's migraines to constitute a severe impairment, ALJ Odell failed to include any limitations resulting from those migraines in Claimant's RFC determination as well as the hypothetical questions posed to the VE at steps four and five. [Dkt. 17 at 17.] The Commissioner responds that the ALJ adequately assessed the evidence pertaining to Claimant's migraines. [Dkt. 18 at 12.]

The most pertinent medical evidence pertaining to Claimant's migraine headaches includes the following information.[5]

- In May 2017, Beth Buchanan, MD, documented that Claimant's headaches occurred daily and that the headache timing had no pattern; aggravating factors included bright lights, head position, and noise; symptoms were relieved by over-the-counter medications, such as Excedrin, and were not relieved by darkness; and associated symptoms included blurred vision, diplopia, dizziness, memory loss, nausea, photophobia, neck stiffness, and vision loss in Claimant's left eye. [Dkt. 15-7 at 24.]

- In March 2018, Dr. Buchanan noted that Claimant's migraine problem had worsened; symptoms were associated with stress; and associated symptoms included blurred vision, dizziness, and neck stiffness. [Dkt. 15-8 at 267.]

---

[5] Claimant also reported headaches and migraines at additional primary care visits and multiple chiropractic visits.

- In October 2018, Claimant completed a headache questionnaire in which she stated that her headaches, which occurred daily, came with nausea, sensitivity to light, tunnel vision, and pain, and that "none of the medicine the doctors have given me work." [Dkt. 15-6 at 20.] She reported that her migraines are "constant," lamenting, "I'm lucky if I have a few hours without them." *Id.*

- In February 2019, Jennifer Hardisty, NP, documented that Claimant's migraines were severe; the problem had worsened; symptoms were constant; headache timing included no pattern and symptoms were associated with stress; and associated symptoms included blurred vision, diplopia, dizziness, nausea, phonophobia, and photophobia. [Dkt. 15-8 at 356.] NP Hardisty noted that Claimant "[s]tates that she has had this migraine x 1wk and is miserable." *Id.* Claimant's diagnoses included "[i]ntractable migraine with aura with status migrainosus," and she was given samples of Emgality. *Id.* at 361.

- In March 2020, Jody Carmony, FNP, documented that Claimant "has tried Emgality which did help reduce headaches however she said she was still having them daily. She would really like somebody to evaluate her and determine a treatment plan to reduce these migraines." [Dkt. 15-9 at 381.] FNP Carmony also noted that "patient reports she takes Tylenol and Excedrin—this medication seems to take the edge off her [so] she can be functionable." *Id.* at 385. Her diagnoses included acute, chronic migraines. *Id.*

It is well understood that an ALJ must formulate a claimant's RFC by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump*, 932 F.3d at 570 (quoting *Varga*, 794 F.3d at 813). Here, ALJ Odell found that Claimant's migraines constituted a severe

impairment. [Dkt. 15-2 at 19.] However, Claimant's RFC includes no explicit limitations as a

result of these migraines, and the ALJ fails to articulate reasons for that omission. *See SEC v.*

*Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[C]ourts cannot exercise their duty of review unless

they are advised of the considerations underlying the action under review."). The relevant

portions of the ALJ's RFC analysis is as follows:

> The claimant also complained of daily headaches (2F/4, 22F/11, 28F/12). Her
> symptoms are associated with stress, but were not aggravated by bright lights or
> noise (22F/11). Associated symptoms include blurred vision, dizziness, and nausea
> (22F/11).
>
> . . .
>
> Given the diffuse tenderness, reported pain, and migraines, the evidence supports a
> limitation to the reduced range of the light exertional level. Due to her symptoms,
> the claimant can occasionally climb ramps and stairs; occasionally balance, stoop,
> kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. . . . However,
> no additional limitations are supported and the claimant's statements about the
> intensity, persistence, and limiting effects of her symptoms are inconsistent with
> the evidence.
>
> . . .
>
> In regards [sic] to her migraines, the claimant reported that the medication Emgality
> reduced her headaches (33F/2). She also reported that over the counter medication
> reduced her pain so that she can be functional (33F/6). Moreover, there were no
> ongoing emergent treatment visits related to uncontrolled migraine pain.

[Dkt. 15-2 at 25.]

As an initial point, ALJ Odell's summary of Claimant's migraine-related evidence is not

accurate. For example, the ALJ's statement that Claimant's symptoms "were not aggravated by

bright lights or noise" (citing the February 2019 exam noted above) ignores notations that

Claimant's symptoms included photophobia, [Dkt. 15-7 at 24; Dkt. 15-6 at 20; Dkt. 15-8 at 356],

and phonophobia, [Dkt. 15-8 at 356], and were aggravated by bright lights and noise, [Dkt. 15-7

at 24]. Additionally, the ALJ's assertion that medication reduced Claimant's migraines and pain

ignores the fact that, in that very same notation, FNP Carmony documented that Claimant "was

still having them daily" and "would really like somebody to evaluate her and determine a treatment plan to reduce these migraines," suggesting that the current treatment was unsatisfactory. [Dkt. 15-9 at 381.] While not required to mention every piece of evidence, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). The ALJ failed to fulfill that obligation here.

Further, as Claimant highlights, it is unclear how the limitations assessed in Claimant's RFC account for her severe migraines because the ALJ did not explain her reasoning. Indeed, ALJ Odell rests her RFC determination on Claimant's "diffuse tenderness, reported pain, and migraines," but the diffuse tenderness and reported pain seemingly pertain to Claimant's fibromyalgia, not her migraines. *See* [Dkt. 15-2 at 24] (ALJ noting that Claimant "has been diagnosed with fibromyalgia," "complained of widespread pain," and that "[d]iffuse widespread tenderness was noted on exam"). There is no logical connection between the evidence regarding Claimant's migraines and the ALJ's limitations that Claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and can never climb ladders, ropes, or scaffolds. *See Crump*, 932 F.3d at 571 (an ALJ's RFC analysis must "say enough" to enable a review of whether the ALJ considered the totality of claimant's limitations); *see also Moore v. Colvin*, 743 F.3d 1118, 1127-28 (7th Cir. 2014) ("The ALJ never related those specific limitations to certain impairments. It is possible to postulate which were related to migraines as opposed to other severe or non-severe impairments . . ., but the reviewing court should not have to speculate as to the basis for the RFC limitations. Nor is the basis otherwise apparent in the record.").

The Commissioner responds that the ALJ "satisfied her obligation to 'minimally articulate' her assessment of limitations related to migraines." [Dkt. 18 at 13] (citing *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012)). However, as explored above, the ALJ's "minimal articulation" in this case does not offer any insight into limitations resulting from Claimant's severe migraines and, further, is based on a mischaracterization of the record in which the ALJ chose to ignore countervailing evidence. The Court is therefore unable to follow ALJ Odell's reasoning, and remand is necessary due to the absence of a logical bridge. On remand, the ALJ shall be sure to properly consider whether any limitations are necessitated by Claimant's migraines, take care not to cherry-pick evidence, and explain the reasoning behind her ultimate determination on this issue.[6]

## V.   Conclusion

For the reasons set forth above, the Commissioner's decision is **REVERSED** and **REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated:  2 MAY 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

---

[6] Having found that the ALJ's decision requires reversal on other grounds, the Court need not address Claimant's final argument that, after the VE testified to work-preclusive off-task behavior and absences, the ALJ failed to address the amount of time that Claimant would be off-task or absent, contrary to the holding of *Lothridge v. Saul*, 984 F.3d 1227 (7th Cir. 2021). [Dkt. 17 at 20.] On remand, though, the ALJ shall be sure to articulate an assessment of whether Claimant is able to meet the on-task and absenteeism requirements of competitive work.

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.